IN THE UNITED STATES DISTRICT COURT

DISTRICT OF KANSAS

THE UNITED STATES OF AMERICA,      )
                                   )
                    Plaintiff,     )   District Court
v.                                 )   Case No.
                                   )   22-10012
RYAN CARL LOWMASTER,               )
                                   )
                    Defendant.     )


TRANSCRIPT OF DETENTION HEARING

    On the 1st day of April, 2021, came on to be heard
proceedings in the above-entitled and numbered cause before the
HONORABLE GWYNNE E. BIRZER, Magistrate Judge of the United
States District Court for the District of Kansas, sitting in
Wichita, commencing at 3:29 P.M. Proceedings recorded by
digital recording.  Transcript produced by computer-aided
transcription.

APPEARANCES:

The plaintiff appeared by and through:
          Mr. Jason W. Hart
          United States Attorney's Office
          301 North Main Street
          Suite 1200
          Wichita, Kansas  67202-4812

The defendant appeared in person and by and through:
          Ms. S. Lynn Burke
          Federal Public Defender's Office
          850 Epic Center
          301 North Main
          Wichita, Kansas 67202

Also present:
          Mr. Corey Kirk, USPO

1          THE COURT:  The court will call the matter of

2     United States v. Ryan Lowmaster.  This is Case

3     No. 22-10012.

4          So can we have appearances for the Government,

5     please.

6          MR. HART:  Thank you, Your Honor.  The Government

7     appears by and through Jason Hart, Assistant United

8     States Attorney.

9          MS. BURKE:  Your Honor, Mr. Lowmaster appears in

10    person and with attorney Lynn Burke.

11         THE COURT:  So -- and these folks here, they're

12    here with Mr. Lowmaster?

13         MS. BURKE:  Yes, Your Honor.

14         THE COURT:  Okay.  All right.  You've been waiting

15    a long time.  It seems like we've had a long docket.  I'm

16    sorry about that, but here we are now.  Okay?  All right.

17         So, Mr. Lowmaster, I don't believe we've met, but

18    I'm Judge Birzer, and I'm presiding over your matter

19    today.  You've previously had, around probably March

20    28th, which is Monday, a Rule 5 hearing and the matter

21    was set over to today.  And you stand before the court on

22    charges of being in possession of a firearm having

23    previously been convicted of a felony.

24         You understand that?

25         THE DEFENDANT:  Yes, ma'am.

1        THE COURT:  All right.  So the matter was set over

2   to today for us to consider whether or not you could be

3   released on some conditions or whether or not this is a

4   situation where you have to be detained.  So I'm going to

5   hear from the Government and then I'm going to hear from

6   Ms. Burke and then we're going to figure out where we're

7   going to.  All right?

8        THE DEFENDANT:  Yes, ma'am.

9        MR. HART:  Thank you, Your Honor.  Your Honor, the

10  Government is requesting detention.  We'd proceed by

11  proffer.  As far as the authority for detention, it

12  arises from 18 U.S.C. § 3142(f)(1)(E) as this is a felony

13  offense otherwise involving a firearm.

14       As sort of factual background for the Court, this

15  matter arose from a Kansas Wildlife and Parks

16  investigation.  Back in -- on July 24th of 2021, Game

17  Warden Colby Austin as called to a farm in northern

18  Montgomery County here in Kansas, where the landowner --

19  the landowner had reported he had surveillance of two

20  trucks pulling into his property and then later hearing

21  two gunshots.  Warden Austin was accompanied by a Wilson

22  County sheriff deputy down to the area directed -- where

23  the landowner directed them, and there they found Ryan

24  Lowmaster, Shane Ballew, and Elizabeth Linnebur in the

25  area, and they admitted to fishing on the landowner's

1  property without permission.

2       While at the scene, Warden Austin observed an

3  AR-15-style rifle sitting on the driver's seat of one of

4  the trucks.  That trucks was identified as

5  Mr. Lowmaster's.  In response Lowmaster claimed that his

6  wife had brought the truck to him and then left in a

7  different vehicle, and further advised that he was not

8  allowed to possess firearms, which is a correct rendition

9  of his circumstances.  Warden -- the latter part, just to

10 be clear.

11      Warden Austin was aware of Lowmaster's prior

12 prison sentence, which I'll discuss a little bit later.

13 He searched the truck and found the Smith & Wesson AR-15,

14 a Walther P22 magazine with .22 caliber ammo, and a Ruger

15 10/22 .22 caliber rifle.  So just to clarify, there's two

16 rifles and then one magazine that would go to a handgun.

17 Warden Austin then asked about a handgun, given what he

18 had observed, and was advised by Mr. Lowmaster that his

19 wife normally carried a handgun with her.  Later -- so

20 that's sort of the scene.

21      And just to put this in perspective, what

22 Mr. Lowmaster is saying is like "This isn't mine, there's

23 an explanation for this, and it's my wife drove this car

24 here," and that is sort of what he is telling the warden

25 and the officers that are there.

1      Later, two days later, Warden Austin returned to

2 the scene and found the pistol that had been dropped in

3 the area.  He found that on July 26th of 2021.  This

4 appeared to have been the pistol that had been used to

5 shoot the fish -- well, let me back up, or let me keep

6 going forward and then I'll back up.

7      Having found that pistol, which appeared to belong

8 to the Walther P22 magazine, the next day, on July 27th

9 of 2021.  Warden Austin then went and interviewed

10 Elizabeth Linnebur, who told him that Lowmaster had used

11 a pistol to shoot a gar that he had caught.  He shot the

12 gar twice.  I don't know if the Court's familiar with

13 what a gar is, but it's essentially a prehistoric fish,

14 and so used the pistol to shoot the gar twice and then

15 pull the gar onto the bank.

16      Ms. Linnebur also advised that Lowmaster's wife

17 had not been to the scene in another vehicle.  And so

18 what we are presented with then is guns found in his

19 possession, in plain view, out in the scene, and while

20 the story that Mr. Lowmaster provides has been sort of

21 refuted by another individual that was there.

22      The nature and circumstances then.  As we look at

23 what -- the (g) factors, the nature and circumstances in

24 this case involve trespass, to start with, as well as the

25 criminal discharge and use of a firearm.  There's also

1  multiple firearms.  And when caught, he tries to lie his

2  way out of it, essentially.

3         Turning then to the (g)(2) factors, the weight of

4  the evidence, the Government would contend, is

5  substantial.  The (g)(3) factors, in terms of the history

6  and characteristics of the defendant, I'm confident the

7  Court has reviewed the pretrial services report.  It's

8  remarkable 'cause there's seven pages of chrono

9  involvements, which is -- it's been a minute since I've

10 had one this long, and I'm not sure I've ever had one

11 this long.

12        But what that history demonstrates is that there's

13 a long history of drug abuse and drug use, and serious

14 drug use involving methamphetamine and other things.  And

15 it starts very early and then continues for the next,

16 virtually, 15, 20 years.  I don't know exactly how long.

17 The most recent drug activity -- I should say the very

18 first crime that jumps out is when he is 20, and that's

19 the battery in Coffeyville municipal court.  But then you

20 have anhydrous ammonia in an unapproved container in June

21 of 2002 out of Wilson County.  And that, from my

22 long-time experience as a prosecutor, I'm going to say

23 prosecutor, I know that's a precursor to making

24 methamphetamine, back when folks were making

25 methamphetamine.  And so that particular case had

1    multiple motions to revoke after he had been placed on

2    probation, which it signals that long ago he was not

3    likely to comply.

4         But then we continue to keep going.  There's a

5    number of additional involvements, again involving

6    themselves with methamphetamine.  We continue on to

7    two -- just three years later, in 2005, a felony theft

8    conviction, which appears to have been a collection -- if

9    I read this or intuit this correctly, there's multiple

10   cases that are filed and ultimately sort of resolved at

11   the same time.  And I believe that's this Wilson County

12   felony theft and the Montgomery County possession of

13   methamphetamine, and then there's Sedgwick County

14   aggravated burglary.  And what's notable is you have

15   movement through different counties, which indicates the

16   defendant is not just sticking to one place, but he's

17   moving around and then committing additional crimes.

18        The Sedgwick County case is probably what's most

19   alarming because it's an aggravated burglary, which is

20   entering a residence when someone's present.  There's a

21   robbery conviction, which is forcibly taking something

22   from somebody, and the additional count of just burglary,

23   and it's residential.  Those are very serious offenses.

24   He ultimately gets 41 months.  Now, that's 2005.

25        And so that takes him out of the mix for a minute.

1  But then when he gets back out we start up again with

2  some small stuff, traffic offenses, of which there's a

3  failure to appear.  But then in 2012, not very long after

4  getting out, we're back to possession of methamphetamine,

5  and other controlled substances.  This time we're adding

6  oxycodone to the mix.  And in that case there's multiple

7  motions to revoke.

8       Now, at the very end of that, I would note, it

9  says "dismissed without prejudice."  I can explain for

10 the Court why that case was dismissed, and, very briefly,

11 it would be that this case -- and I believe there's three

12 additional cases that show up as being dismissed either

13 on August 6th of 2014 or August 15th of 2014 -- those

14 cases were --

15      THE COURT:  Went federal.

16      MR. HART:  Well, they didn't exactly go federal,

17 but because matters went federal, the counties agreed to

18 dismiss their cases based upon Mr. Lowmaster agreeing to

19 certain terms in federal court.

20      THE COURT:  Okay.  I see.

21      MR. HART:  And so you have a number of -- while

22 those cases are dismissed and I think the Court would

23 tend to look at those and go, "Well, they were dismissed,

24 disposed of."  The defendant sort of acknowledges some of

25 these are picked up in the federal case, because there's

1  two different felon in possession charges, one of which

2  involved the theft of, in my memory serves, 30, 20 -- it

3  was a boatload of guns.  I think at the end of the day

4  there's some 32 firearms that are all associated with

5  Mr. Lowmaster across those cases, if my memory of the --

6  well, actually it references it here in the bond report

7  that there's 32 firearms.

8       But within those cases, you still have additional

9  burglaries, possession of a firearm.  We continued to

10 have taking or dealing in wildlife, which presumably is

11 sort of like our current version of poaching, which

12 frequently is going to be done with a firearm, but we're

13 not sure exactly what that is.

14      The Labette County -- we now move over to Labette

15 County, where we have an additional methamphetamine and

16 residential burglary.  That's one of those cases that's

17 dismissed.

18      Then you get to the federal court.  And what is

19 notable in that particular case is that he ultimately,

20 once he serves his sentence and gets out on supervised

21 release, then that is revoked because he commits a new

22 crime, which involves theft of property across state

23 lines, if my memory serves correctly, from Oklahoma to

24 Kansas, and then also tested positive for

25 methamphetamine.  There may have been -- and it may be

1   that it was actually a worthless check that was given as

2   well around this time.  There were a number of issues

3   that arose for Mr. Lowmaster at that time resulting in

4   Judge Melgren revoking him and giving him the "full

5   monty" of 24 months and no supervised release to follow.

6          That then brings us to additional activity going

7   on in Osage County, Oklahoma, and then Washington County,

8   Oklahoma, the latter involving obstructing an officer.

9   On that point of obstruction, one of the features -- one

10  of the things that factor into his earlier case in

11  federal court was the fact that he actually attempted to

12  get a witness, to enlist a witness to provide a fixed

13  story to get him out of trouble, essentially.  We include

14  that in the factual basis for the guilty plea, and he

15  expressly acknowledged that as a guideline enhancement in

16  the factoring of the guidelines in that particular case.

17         So, Your Honor, with that history and

18  characteristics associated with this defendant, you have

19  drug abuse, you have crimes involving dishonesty, theft

20  and whatnot, you have battery, you have robbery, you have

21  residential burglaries and a lot of them, and they are

22  continuous and continual.  The only breaks that really

23  happen is when he's in jail or prison.  That factor

24  weighs strongly in favor of detention from the

25  Government's perspective.

1        As far as the (g)(4) factor, the nature and

2   seriousness of the danger posed, one of the concerns that

3   we have is that Mr. Lowmaster may try to influence

4   witnesses at the scene.  Even though the case is strong,

5   that was sort of the same sort of circumstances the last

6   time around, and there was some effort to try to get

7   somebody to take -- take the fall or to point the finger

8   at somebody else.  And so we do have some concerns that

9   that might happen in this case.

10        But I think more alarming is the fact that

11   Mr. Lowmaster continues to involve himself with firearms

12   and with trespassing, and this could have been a super

13   bad situation if that landowner had walked down there and

14   confronted him personally and we end up having a

15   shoot-out.  And that's exactly what we want to avoid.

16        And while I don't have any instance where

17   Mr. Lowmaster has shot somebody, we do have robbery, we

18   do have battery, we have burglaries, and we have constant

19   involvement with firearms.  And I don't know how

20   Mr. Lowmaster does not understand:  "You cannot have

21   firearms.  You can't have 'em.  You can't use 'em.  Don't

22   be around 'em."  But apparently that message isn't

23   getting through.

24        And so with all those things taken into

25   consideration, Your Honor, the Government is requesting

 1  detention.  We'd ask that he be detained pending further

 2  proceedings.  Thank you, Your Honor.

 3          THE COURT:  Thank you.

 4          Ms. Burke?

 5          MS. BURKE:  Thank you, Your Honor.  I heard at

 6  least twice that Mr. Lowmaster has a history of battery.

 7  And that struck me because I don't remember reading about

 8  a history of battery.  And when I look at the pre -- the

 9  bond report, I see a "not reported" -- "not convicted"

10  allegation of misdemeanor battery from 1993 when

11  Mr. Lowmaster was 13, and I see one conviction from 2000

12  for misdemeanor battery where he got five days.

13          So battery, misdemeanor, my understanding can just

14  be any unwanted touching, so to allege that Mr. Lowmaster

15  has a history of battery, I think, is dramatically

16  overstating the situation from one conviction from 2000.

17  I don't know the context of that case 'cause there's no

18  information provided.

19          That aside, that struck me because when I look at

20  this I don't see any convictions for crimes of violence.

21  I see a history of substance abuse, anhydrous.  I see

22  crimes against property, burglary, but no crimes of

23  violence.  So that said, Mr. Lowmaster was released from

24  the Bureau of Prisons in 2019.  I do not see any

25  convictions since 2019, which leads me to believe since

1  that time he has rehabilitated until this point where we

2  reach today.

3          There are many people from the community here on

4  his behalf.  His mother would like to speak if the Court

5  would allow that after I finish.  This is another case

6  where the allegations come from July of 2021, so, again,

7  we've got another eight months with no incidents.  Unlike

8  the prior hearing, which was also alleged from July of

9  2021, there's no allegation that Mr. Lowmaster is roaming

10 the community at large with weapons.

11         What I understand the allocution of the Government

12 is that this was a situation where people were seemingly

13 hunting.  I'm always at a disadvantage because I don't

14 have any discovery to present to the Court on

15 Mr. Lowmaster's behalf.  So what I hear is there's

16 multiple people there and that there were some shots

17 fired, seemingly in a situation where they're hunting.

18         I, again, didn't hear any recitation of *Miranda*

19 warnings, but I do hear statements of my client's being

20 used against him.

21         The guidelines calculate a six-level reduction if

22 the reason that the person had the weapon that they're

23 not allowed to have for the purpose of sporting or -- and

24 I'm constructing "sporting" to be for hunting.  Again, I

25 just mention this because it's not the same situation the

1  Court is concerned about where someone's roaming around

2  in a car with a weapon for whatever purpose, we don't

3  know.  The purpose here, if the allegations are true,

4  seem to be for hunting.

5        So I assert to the Court that Mr. Lowmaster is not

6  a danger to the community.  And I think that works in

7  conjunction with my argument he's not a flight risk.  I

8  don't think it's been alleged that he's a flight risk.

9  But to show he's not a danger and his ties to the

10 community, he has family members here.  He has a

11 supportive fiancée, who understands that he's on pretrial

12 supervision, what that would entail.  She has, according

13 to the bond report, removed the firearms from the home

14 and would be supportive of his pretrial supervision in

15 the home.

16        He rents the property from his mother, who, again,

17 would like to speak today.  They have children together,

18 his daughter and a 14-year-old son -- I think it's a

19 stepson --

20        THE DEFENDANT:  That's right.

21        MS. BURKE:  -- stepson who reside in the home, and

22 he supports them, my understanding and from the bond

23 report, is through his own business.  He owns and

24 operates Lowmaster Heating & Air, which he uses to

25 support his family.  I'm sure the Court recalls from the

1  bond report that his father, who is the pillar of their

2  family, died in 2019, and his mother is 72 years old.  He

3  helps support her, and she would like to tell the Court

4  about that if the Court would allow that.

5          THE COURT:  Okay.  Ms. Lowmaster.

6          MS. BURKE:  Can she speak from here?

7          THE COURT:  Yes, she can, but we have to be able

8  to hear her and get her on the record, so you can take it

9  there.  I don't want you to feel like you're a witness or

10  cross-examined.  I just want to hear what you have to

11  say.  Okay?

12          MS. BURKE:  Would you like her to approach this

13  microphone?

14          THE COURT:  Yeah, just so she can talk in the mic

15  and we can get her on the record.

16          MS. LOWMASTER:  Thank you.

17          THE COURT:  Yes.  I want you to have a seat and I

18  want you to talk into the mic if you'd be so kind so we

19  can hear you 'cause we're taking a record.  Okay?  All

20  right.  There you go.

21          MS. MILLER:  Okay.  I'm Arlene Lowmaster and I'm

22  Ryan's mom.  Okay?  Yes, my husband did pass away three

23  years ago, and he lives -- Ryan lives right next door in

24  the trailer that he rents from me.  He helps me a lot.

25  We have 27 acres, a lot of mowing, a lot of animals.  And

1  if you (inaudible) I can't even lift the gas cans to fill

2  the mowers.  He's just a big help to me and I have to

3  have him home.  He hasn't done anything bad since he got

4  out of prison.  I mean, I know he shouldn't have had a

5  gun, I guess, you know, but no trouble, no arrests, never

6  no drugs, thank God, you know, I just pray that.

7        And he's just been a lot better boy -- and he's

8  not a boy anymore.  I don't know what I would do if he

9  had to go away again.  I'd (inaudible).  I lost my

10  husband, and I just lost my twin sister in December, so

11  I'm lost.  And he's my family.  Yeah.

12        If I ever see him have a gun again, I'll shoot him

13  with it.  No, I hate guns.  I don't even have a use for

14  them.  I just think it was a bad, bad decision and

15  mistake.  Okay?  I know that.  I just -- he's come a long

16  ways.  He started his own business, works hard.  He has

17  to support -- his little baby was born at 1 pound and 10

18  ounces, so she can't work.  She has to go to physical

19  therapy two times a week and goes to speech therapy, so

20  right now she's unable to work, so he is the only one

21  supporting them.

22        And his daughter lives with him, and she's 16 and

23  Brock is 14, I think.  So they all live together and he's

24  the only supporter.  That's all they have.  I can't

25  support everybody.  Yeah.  So we'd just ask that you bear

1  that in mind and let him stay home.  I need him at home.

2  Okay?  Okay?

3       THE COURT:  Thank you.

4       MS. LOWMASTER:  Thank you, Your Honor.

5       MS. BURKE:  I've nothing further.  Thank you.

6       THE COURT:  Mr. Hart, did you have something?

7       MR. HART:  Yes, Your Honor.  I would direct the

8  Court to page 8, which lists the aggravated burglary,

9  robbery, and burglary residential convictions, in

10  response to the defendant's claim that there's not a

11  history of any sort of violence.  And the concern I have

12  is you go back from battery and then you have these

13  things, and now you escalate to robbery.  That's deeply

14  concerning.  And then we get into where firearms now are

15  starting to appear.  And this particular set of

16  circumstances is not one where there's -- it's just a

17  mistake.  It's not a mistake and it's not hunting.

18       You don't need a gun to go fishing.  And you

19  certainly don't need two rifles and a pistol.  This isn't

20  hunting; this is just Mr. Lowmaster seemingly doing what

21  Mr. Lowmaster does, which is rolling around with

22  firearms.  And he got caught and tried to lie his way out

23  of it, left a handgun there where if somebody else had

24  come down there, some kid goes fishing and finds a gun

25  sticking in the mud, this is who we're dealing with.  And

1  given these concerns, it's not a mistake.

2         There's an additional concern that I have, which

3  the reference to gonna go back home is essentially what

4  he -- he intends to go back home.  And the pretrial

5  services report indicates that if he returns to the

6  residence, they agree to reconcile.  Now, this is the --

7  I believe the fiancée of the defendant.  It's somewhat

8  discordant from the sounds of what is reported to U.S.

9  Probation, but they've agreed to reconcile.

10         But what's also then troubling is she has removed

11 firearms which belong to her from the residence.  My

12 concern is is that we have firearms back in the day.  We

13 still have firearms that have only lately been removed.

14 I just don't feel like Mr. Lowmaster gets it, how he

15 needs to not be around firearms.  And where you have a

16 discordant relationship, that while they've chosen to

17 reconcile now, we're adding the stress of looking at more

18 prison time, and that concerns me because largely of

19 Mr. Lowmaster's history.  And he is a 42-year-old man.  I

20 shouldn't think it would be very hard to walk out there

21 with a fishing pole and leave the guns that I'm not

22 supposed to have nowhere.

23         So with those things in mind, Your Honor, we

24 persist in our request for detention.

25         THE COURT:  All right.  Anyone else want to say

1  anything?

2      MS. BURKE:  Well, Your Honor, I'm looking it up

3  right now 'cause my memory might be wrong, but

4  misdemeanor battery, not a crime of violence; burglary,

5  not a crime of violence.  So Mr. Lowmaster's fiancée is

6  here if the Court needs to hear from her if there's

7  something the Court is still concerned about.  She's in

8  the hallway with the young child.

9      THE COURT:  Okay.

10     MS. BURKE:  Thank you.

11     THE COURT:  Well, I'm going to go down these

12  factors that I have to consider and see where we're going

13  to end up.  I think that the nature and circumstances of

14  this case is unfortunate here.  Started from a trespass,

15  and I do think that that weighs in your favor for

16  purposes of detention because it was a -- it arose from a

17  trespass.

18     I think the weight of the evidence against you

19  with regard to having a firearm having previously been

20  convicted of a felony is strong.

21     Your history, I think it's admirable that you have

22  family members, you know, your own your own business,

23  live next door to your mom.  And you've messed up.  You

24  know, you have.  And you now have the benefit of living

25  on 27 acres with animals and things that can keep -- that

1   you can put in your hand other than a firearm.

2        But your criminal history shows that you just

3   don't respect the law.  You deal in weapons.  I mean, I

4   can look through this and see, you know, I mean, I don't

5   know where Ms. Burke is looking, but I see aggravated

6   burglary.  I don't see burglary; I see aggravated

7   burglary, which tells me that's a person situation.  I

8   see robbery, and then residential burglary.

9        And then you've been in federal court before

10  because of weapons.  You can't have weapons.  And I

11  think, you know -- I feel bad for your mother.  I was

12  moved by her comments, but I'm going to have you detained

13  because you should not have a gun.  I don't know what it

14  will take to have -- and this is the most -- this is not

15  a minor situation, but this is unnecessary.  This was

16  unnecessary for you to have a weapon on somebody else's

17  property and not supposed to.  And I think that your

18  disregard for the law in that regard, to me that makes

19  you dangerous.  Maybe not in this particular situation,

20  but I -- but for you to have a disregard for the law on

21  someone else's private property, with a gun, dispose

22  of the -- you know, there's evidence of disposing of the

23  gun where anybody else -- you created a dangerous

24  situation.

25        And I am sorry that -- you know, Mrs. Lowmaster, I

1  am sorry that he won't be around to help you and all of

2  that.  Your statements were moving to me.  But I am

3  responsible for providing a level of protection to the

4  community, and as long as I continue to let your son roam

5  Wilson County, aware that he is with guns, with what he

6  deals in weapons, and he can't have weapons.

7        And every time that he comes to court, every time,

8  Mr. Lowmaster, that you come to court on a weapons

9  charge, this is going to be the outcome.  So you have to

10  decide.  Like I told the other person, you have to

11  decide.  I'm not against weapons.  I'm against weapons

12  for people who shouldn't have them, that are in violation

13  of the law.  You've known since you were 22 years old

14  that you couldn't have a weapon.  You've known since you

15  were 25 years old that you couldn't have a weapon.

16        You can't have a gun.  You cannot.  Not even to

17  hunt.  And I do agree that there may be mitigating

18  factors, as your counsel said, but that's for a different

19  day.  That's for a different day.  And as long as, you

20  know, from where I sit this looks like, you know -- you

21  have very little respect for the law because you've gone

22  to prison once for having a gun, and here we are back

23  with the same charge.  And so, I mean, you've tied

24  everybody -- you've tied your mother's hands, you've tied

25  my hands, you've tied everybody's hands.  So I'm going to

1  order that you be detained until further order of the

2  court.

3       Anything else?

4       MS. BURKE:  No, thank you.

5       MR. HART:  No, Your Honor.

6       THE COURT:  We're adjourned.

7       (Whereupon, the proceedings were concluded at

8  4:00 o'clock P.M.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE


I certify that the foregoing is a correct transcript from the

record of proceedings in the above-entitled matter.



                              s/ Johanna L. Wilkinson
                              Johanna L. Wilkinson, CSR, CRR, RMR
                              United States Court Reporter